# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Christopher Gerald Harper, Respondent.

Appellate Case No. 2015-000932

---

Opinion No. 27570
Submitted August 20, 2015 – Filed September 9, 2015

---

### DISBARRED

---

Lesley M. Coggiola, Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

Christopher Gerald Harper, of Durham, North Carolina, *pro se*.

---

**PER CURIAM:** This attorney disciplinary matter is before the Court pursuant to the reciprocal disciplinary provisions of Rule 29 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR).

Respondent was admitted to the North Carolina Bar on August 23, 1991, and to the South Carolina Bar on November 12, 1991. On November 15, 2014, respondent was disbarred from the North Carolina Bar for misconduct involving several instances of misappropriation of client funds, and failing to conduct required trust account reconciliations and maintain accurate financial records. *See The North Carolina State Bar v. Harper*, Order of Discipline, Case No. 13 DHC 29 (November 15, 2014) (attached).

Respondent failed to inform the Office of Disciplinary Counsel (ODC) of his discipline in North Carolina as required by Rule 29 (a), RLDE. Once ODC learned of respondent's disbarment, it filed a certified copy of the North Carolina

disciplinary order with the Court.  *See* Rule 29(a), RLDE.  As required by the provisions of Rule 29(b), the Clerk of Court provided ODC and respondent with thirty (30) days in which to assert whether identical discipline should not be imposed in this state.   ODC filed a return stating it had no information that would indicate the imposition of identical discipline was unwarranted.  Respondent did not file a return.

Since the record of the disciplinary proceeding in North Carolina comports with due process, respondent does not assert that the imposition of identical discipline in this state is unwarranted, and the Court has disbarred lawyers for similar misconduct, the Court finds that reciprocal discipline is appropriate and hereby disbars respondent from the practice of law in South Carolina.  *See* Rule 29(d), RLDE; *see also In the Matter of Auman*, Op. No. 27549 (S.C. Sup. Ct. filed July 23, 2015) (Shearouse Adv. Sh. No. 29 at 26); *In the Matter of Newton*, 402 S.C. 365, 741 S.E.2d 23 (2013).

Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

**TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.**

TATE OF NORTH CAROLINA

WAKE COUNTY

BEFORE THE
DISCIPLINARY HEARING COMMISSION
OF THE
NORTH CAROLINA STATE BAR
13 DHC

| | |
|---|---|
| THE NORTH CAROLINA STATE BAR,<br><br>Plaintiff<br><br>v.<br><br>CHRISTOPHER G. HARPER, Attorney,<br><br>Defendant | ORDER OF DISCIPLINE |

THIS MATTER was heard on May 22-23, 2014, July 28, 2014, and September 25-26, 2014 by a hearing panel ("panel") of the Disciplinary Hearing Commission ("DHC") composed of Steven D. Michael, Chair; Donald C. Prentiss; and , Michael S. Edwards pursuant to 27 N.C.A.C. 1B § .0114 of the Rules and Regulations of the North Carolina State Bar. Barry S. McNeill, Deputy Counsel, represented Plaintiff, the North Carolina State Bar. Eric C. Michaux represented Defendant at the first two days of the hearing on May 22-23, 2014, and subsequently withdrew with permission of the panel. Defendant, Christopher G. Harper, represented himself upon the resumption of the hearing on July 28, 2014 and September 25-26, 2014.

Based upon the pleadings and evidence introduced at the hearing, the panel hereby finds by clear, cogent and convincing evidence the following

**FINDINGS OF FACT**

1. Plaintiff, the North Carolina State Bar ("State Bar"), is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar (Chapter 1 of Title 27 of the North Carolina Administrative Code).

2. Defendant, Christopher G. Harper ("Harper" or "Defendant"), was admitted to the North Carolina State Bar on August 23, 1991, and is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar and the Rules of Professional Conduct.

3. During all of the relevant periods referred to herein, Defendant was engaged in the practice of law in the State of North Carolina and maintained a law office in Durham, Durham County, North Carolina.

4.     Defendant maintained a trust account at Wells Fargo Bank (formerly Wachovia) with an account number ending in No. -8883 (hereinafter "trust account").

5.     Defendant maintained a business operating account at Wells Fargo Bank (formerly Wachovia) with an account number ending in No. -5187 (hereinafter "operating account").

## FINDINGS OF FACT REGARDING FIRST CLAIM FOR RELIEF

6.     On January 13, 2012, William K. Graham ("Graham") of Versailles Realty Partners, L.L.C. ("VRP"), engaged Defendant to complete a real estate transaction for his purchase of Mary L. Henry's 1/15 interest in property located at 511 Dupree Street, Durham, North Carolina ("511 Dupree Street").

7.     VRP agreed to purchase the property interest from Ms. Henry for $3,000, and to pay a fee to Defendant of $800 for his legal services to complete the transaction.

8.     On or about January 17, 2012, Graham paid Defendant via a check in the amount of $3,800, which Defendant acknowledged receiving as "earnest money" to be held in "escrow" until the deed was returned from Ms. Henry for the purchase of her interest in the property.

9.     Instead of depositing and holding the earnest money and fee in his trust account, Defendant cashed the check from Graham and utilized the proceeds for his own benefit.

10.     On February 8, 2012, Defendant forwarded to Ms. Henry a contract signed by Graham, a quitclaim deed concerning "511 Dupree Street" to be signed by Ms. Henry, and a settlement statement showing that Ms. Henry would receive $2,000 of the $3,000 paid by Graham, and that Defendant would receive $1,000 as his attorney's fee from Ms. Henry.

11.     Defendant requested that Ms. Henry sign and return the enclosed documents to Defendant's office.

12.     On April 23, 2012, Defendant issued trust account check number 2823 payable to himself in the amount of $3,000, which Defendant utilized that same date to purchase a cashier's check in the amount of $3,000 payable to "Mary L. Henry."

13.     On check number 2823, Defendant attributed the withdrawal on the memo line to "Mary L. Henry."

14.     At the time Defendant made the withdrawal of $3,000 from his trust account via check number 2823 on April 23, 2012, Defendant was not holding and had not deposited any funds in his trust account for William K. Graham, Graham's VRP, or Ms. Henry.

15.     Ms. Henry declined to sign the quitclaim deed of her interest to Graham.

16.     Defendant never forwarded the cashier's check to Ms. Henry.

2

17. On June 4, 2012, Graham filed a grievance against Defendant with the State Bar claiming that Defendant had failed to complete the real estate transaction between VRP and Ms. Henry, and that Defendant would not refund the money Graham had provided to fund the transaction.

18. A State Bar investigator contacted Defendant on June 6, 2012 and informed him that the State Bar had received a complaint from Graham about the real estate transaction involving Ms. Henry's interest in the property located at 511 Dupree Street.

19. Following the State Bar investigator's contact with Defendant, Graham approached Defendant on June 6, 2012 and demanded the return of VRP's $3,800 in entrusted funds.

20. Using the uncashed cashier's check in the amount of $3,000 referenced in Paragraph 12 above, on June 6, 2012 Defendant purchased another cashier's check from Wells Fargo Bank on West Club Boulevard in Durham, North Carolina in the amount of $3,800 payable to VRP.

21. On June 6, 2012, Defendant paid to Graham the purported refund of the $3,800 using the cashier's check in the amount of $3,800 payable to VRP.

22. Defendant never replaced the $3,000 he withdrew from his trust account to purchase the cashier's check payable to Ms. Henry.

23. At the time Defendant made the withdrawal of the $3,000 from his trust account referenced in Paragraph 12 above, Defendant was not holding and had not deposited any funds in his trust account for Graham, VRP, or Ms. Henry.

24. Defendant made inconsistent statements to the State Bar investigator about whether he had placed the $3,800 in entrusted funds from VRP in his trust account or had cashed the check from VRP.

25. Defendant's bank records, including the bank records for his trust account and operating account, showed that Defendant never deposited the $3,800 check from VRP in either account.

26. Defendant eventually admitted to the State Bar investigator that he had cashed the $3,800 check from Graham's VRP.

27. Defendant's trust account records showed that Defendant used entrusted settlement funds belonging to Defendant's client Courtney Tanner to purchase the cashier's check in the amount of $3,000 payable to Ms. Henry, which Defendant eventually used to refund the $3,800 to Graham's VRP.

28. Courtney Tanner did not authorize Defendant to utilize his $3,000 in entrusted settlement funds to purchase the cashier's checks which were eventually used to refund the $3,800 to Graham's VRP.

29. Defendant misappropriated $3,000 from VRP and then misappropriated $3,000 from Tanner to cover the misappropriation from VRP.

3

## FINDINGS OF FACT REGARDING SECOND CLAIM FOR RELIEF

30.     Henry L. McGhee ("McGhee") retained Defendant on or about August 21, 2009 to represent him in connection with injuries he sustained in a motor vehicle accident that occurred on August 17, 2009.

31.     On August 21, 2009, McGhee signed a contingent fee agreement under which Defendant would receive 33⅓% of any settlement.

32.     Defendant and the insurance company settled McGhee's claim for $3,500, which Defendant deposited in his trust account on February 2, 2010.

33.     Under Defendant's contingent fee agreement with McGhee, on February 3, 2010 Defendant disbursed to himself, via check number 2761 from his trust account, his contingent fee of $1,166.65.

34.     McGhee was entitled to $2,333.35 of the settlement proceeds deposited in Defendant's trust account.

35.     Defendant made a disbursement from his trust account to McGhee of $550 via check number 2762 on February 12, 2010, noting "Medpay" on the memo line of the check.

36.     Defendant had received a check from Progressive Universal Insurance Company, issued October 27, 2009, in the amount of $750 for McGhee's medical expenses.

37.     Defendant's client ledger card for McGhee did not reflect the deposit of the $750 into Defendant's trust account on behalf of McGhee.

38.     On February 12, 2010, McGhee signed a settlement statement acknowledging receipt of check number 2762 from Defendant for $550.

39.     Although Defendant designated the $550 to McGhee as a disbursement from the $3,500 February 2, 2010 settlement proceeds, the $550 to McGhee should have been attributed to the $750 "Medpay" proceeds received from Progressive Universal Insurance Company on or about October 27, 2009.

40.     Defendant made a disbursement from his trust account to McGee of $500 via check number 2810 on April 21, 2010.

41.     Except for the disbursement referenced in Paragraph 40 above, Defendant made no other disbursements from his trust account by check payable to McGhee of the funds to which McGhee was entitled under the settlement.

42.     Between March 10, 2010 and April 29, 2010, Defendant made disbursements payable to himself totaling $1,145 from McGhee's entrusted settlement funds via the following checks:

| CHECK NUMBER | DATE | AMOUNT |
| --- | --- | --- |

4

| 2765 | March 10, 2010 | $200 |
|------|----------------|------|
| 2766 | March 17, 2010 | $400 |
| 2779 | April 9, 2010 | $25 |
| 2811 | April 21, 2010 | $100 |
| 2768 | April 22, 2010 | $120 |
| 2769 | April 24, 2010 | $100 |
| 2770 | April 28, 2010 | $200 |

43. According to Defendant's client ledger card for client "Henry McGhee," on April 28, 2010 there remained a balance of $138.35 in Defendant's trust account of the settlement funds to which McGhee was entitled.

44. Defendant testified that the $138.35 was his earned money, but that he paid McGhee the $138.35 in cash.

45. Defendant testified that all the checks made payable to himself on McGhee's client ledger card, except the check for Harper's fee of $1,166.65, were cashed, with the cash being given to McGhee.

46. Defendant admitted that he did not obtain receipts from McGhee and does not have any documentation of the cash given to McGhee.

47. There was no documentation or notation of the $138.35 alleged cash payment to McGhee on Defendant's client ledger card for McGhee.

48. On Defendant's Settlement Statement for client "Henry McGhee," Defendant made a notation by asterisk that the balance of the settlement owed to McGhee ($2,333.35) was to be "[held] in trust and disburse per client[;] also apply to additional cases[,] i.e. DWI Roxboro".

49. In 2010, McGhee did not retain Defendant to represent him on a driving while impaired charge in Person County, North Carolina courts.

50. In 2010, Defendant did not represent McGhee on a driving while impaired charge in Person County, North Carolina courts.

51. Other than representing McGhee in connection with the settlement of his personal injury claim during 2009-2010, Defendant did not perform additional legal services for McGhee or bill McGhee for such services during 2009-2010.

52. Defendant never provided McGhee a copy of the settlement statement showing the disbursements related to the $3,500 settlement funds.

53. On Friday, May 7, 2010, McGhee and his girlfriend met with Defendant at Defendant's office in Durham to receive a payment from the settlement proceeds referenced in Paragraph 32 above.

54. On May 7, 2010, Defendant wrote a check payable to McGhee in the amount of $500, and gave McGhee the check.

5

55. Defendant wrote the check to McGhee, referenced in Paragraph 54 above, on his operating account, not from his trust account into which he had deposited McGhee's settlement funds.

56. McGhee testified that on one or two occasions, Defendant provided him cash disbursements in the amount of $100 to $200.

57. McGhee testified that he only received from Defendant approximately $1,200 of the $2,333.35 in entrusted settlement proceeds to which he was entitled, including the $500 disbursement to him from Defendant's trust account on April 21, 2010, the $500 from Defendant's operating account on May 7, 2010, and $100 to $200 in cash provided to McGhee from Defendant.

58. The hearing panel finds McGhee's testimony, referenced in Paragraphs 56 and 57 above, to be credible.

59. Defendant disbursed to McGhee no more than $1,750 of the $4,250 total proceeds Defendant received on McGhee's behalf.

60. Defendant disbursed to himself and/or utilized for his own benefit $1,133.35 of entrusted settlement proceeds to which McGhee was entitled.

61. Defendant misappropriated $1,133.35 of McGhee's entrusted settlement funds.

## FINDINGS OF FACT REGARDING THIRD CLAIM FOR RELIEF

62. A motor vehicle struck the residence of Nancy J. Mack ("Mack") in Durham, North Carolina on January 2, 2009, causing property damage and alleged bodily injury to Mack.

63. Mack initially negotiated with her homeowner's insurance, Nationwide Insurance ("Nationwide"), and GMAC, the insurer of the responsible party (Kimberly Conely).

64. Nationwide paid Mack an initial $832.68 for temporary lodging.

65. On January 6, 2009, GMAC paid Mack $6,990.92 for property damage.

66. On February 5, 2009, GMAC paid Mack an additional $17,495.06 for property damage, and reimbursed Nationwide for the $832.68 in temporary lodging.

67. After becoming frustrated with her ongoing negotiations with GMAC, Mack retained Defendant on October 6, 2009 to represent her in connection with her remaining property damage and personal injury claims against GMAC.

68. On October 6, 2009, Defendant and Mack signed a contingent fee agreement under which Defendant would receive 35% of any settlement amount above $3,000.

6

69.     In addition to $25,318.66 previously paid to Mack, Defendant and GMAC settled Mack's remaining claims on or about January 3, 2011 for an additional $3,000 in property damage and $5,000 for bodily injury.

70.     On or about January 7, 2011, Defendant received from GMAC checks in the amount of $3,000 for settlement of Mack's property damage claim and $5,000 for settlement of her bodily injury claim.

71.     On January 7, 2011, Defendant deposited the $5,000 insurance check for Mack's bodily injury claim in his trust account.

72.     Under Defendant's retainer agreement with Mack, referenced in Paragraph 68 above, on January 7, 2011 Defendant disbursed to himself from his trust account via check number 2786 his contingent fee of 35% of the settlement amount above $3,000 (35% of $5,000), which amounted to $1,750.

73.     On February 2, 2011, Defendant disbursed to himself from his trust account via check number 2789 an additional $914 as a fee from Mack.

74.     On February 28, 2011, Defendant deposited into his trust account the $3,000 insurance check for Mack's property damage claim.

75.     Defendant did not notify Mack of his receipt of the settlement checks from GMAC referenced in Paragraph 70 above.

76.     According to the contingent fee arrangement, referenced in Paragraph 68 above, Mack was entitled to $6,250 of the settlement proceeds deposited in Defendant's trust account referenced in Paragraphs 71 and 74 above.

77.     Between February 17, 2011 and June 3, 2011, Defendant made disbursements payable to himself totaling $5,350 from Mack's entrusted settlement funds via the following checks:

| CHECK NUMBER | DATE | AMOUNT |
| --- | --- | --- |
| 2792 | February 17, 2011 | $1,000 |
| 2793 | February 25, 2011 | $500 |
| 2787 | March 10, 2011 | $250 |
| 2795 | April 8, 2011 | $150 |
| 2796 | April 15, 2011 | $250 |
| 2798 | May 4, 2011 | $100 |
| 2797 | May 11, 2011 | $100 |
| 2799 | May 18, 2011 | $150 |
| 2800 | May 19, 2011 | $2,500 |
| 2801 | May 27, 2011 | $100 |
| 2802 | May 27, 2011 | $150 |
| 2803 | June 3, 2011 | $100 |

78.     Defendant had no documentation that the disbursements from Mack's entrusted funds to himself (outside of his $1,750 fee) were pursuant to any agreement with Mack.

7

79. As of June 3, 2011, Defendant's client ledger card for Mack showed a balance of $236, with no disbursements having been made to Mack of the entrusted settlement proceeds deposited in Defendant's trust account.

80. On July 28, 2011, Defendant made a deposit to his trust account in the amount of $4,000.

81. Defendant's client ledger card for Mack showed the $4,000 deposit referenced in Paragraph 80 above as having been credited to Mack.

82. Defendant made the deposit referenced in Paragraph 80 above by check number 1382, dated July 28, 2011, in the amount of $4,000, drawn on his operating account.

83. Defendant deposited the $4,000 into his trust account to cover the shortage of Mack's entrusted settlement funds in his trust account, which had fallen to a balance of $236 on June 3, 2011 according to Defendant's client ledger card for Mack.

84. On July 28, 2011, Defendant disbursed to Mack a check (check number 2807) from his trust account in the amount of $6,250.

85. According to Mack's client ledger card referenced in Paragraph 81 above, the disbursement of the $6,250 to Mack on July 28, 2011 created a negative balance of $2,014 in Mack's account.

86. Defendant's client ledger card for Mack, referenced in Paragraph 81 above, omitted check number 2796, dated April 15, 2011, made payable to Defendant in the amount of $250.

87. Because of Defendant's omission of check number 2796 in the amount of $250 on Mack's client ledger card, as referenced in Paragraph 86 above, Defendant's disbursement of the $6,250 to Mack on July 28, 2011, as referenced in Paragraph 84 above, created a negative balance of $2,264, not $2,014, in Mack's account.

88. Defendant used Mack's entrusted funds for his and/or someone's personal benefit during the months of February to sometime in late July or August 2011.

89. Because Defendant had disbursed to himself a total of $6,264 ($914 + $5,350) of Mack's entrusted funds for his and/or others personal benefit, and only deposited $4,000 from his operating account to cover the shortage created by the disbursements, Defendant used another client's entrusted funds (see Paragraph 104 below) to make up the $2,250 shortage in order to pay Mack the $6,250 to which Mack was entitled.

90. Defendant's disbursements to himself (outside of his $1,750 fee) during February to June 2011 totaling $6,264 ($914 + $5,350) were misappropriations from Mack's entrusted funds for his own and/or someone else's personal benefit, even though Defendant eventually paid Mack the full $6,250 to which she was entitled.

## FINDINGS OF FACT REGARDING FOURTH CLAIM FOR RELIEF

8

91. Shanicka Lewis ("Lewis") retained Defendant to represent her minor son in connection with injuries he sustained in a motor vehicle accident that occurred on July 31, 2008.

92. Lewis signed a contingent fee agreement under which Defendant would receive 33⅓% of any settlement amount and 10% of the initial $1,000 in Medicaid reimbursement.

93. On or about April 25, 2011, Defendant and Lewis, on behalf of her minor son, agreed to a structured settlement with the insurance company, including a cash settlement of $15,500 and guaranteed future lump sum payments to the minor son.

94. By consent order filed on July 11, 2011, Superior Court Judge Orlando Hudson approved the structured settlement referenced in Paragraph 93 above, specifically directing Defendant to make, among other disbursements from the settlement funds, an immediate payment of $2,375.91 to the North Carolina Department of Health and Human Services, Division of Medical Assistance, for medical expenses incurred by Lewis's minor son.

95. On July 11, 2011, Defendant deposited the $15,500 insurance settlement check referenced in Paragraph 90 above in his trust account.

96. Under Defendant's retainer agreement with Lewis and the terms of the consent order, on July 14, 2011 Defendant disbursed to himself a check (check number 2806) from his trust account for $11,933.32, representing a contingent fee of 33⅓% of the settlement ($11,833.32) plus 10% of the initial $1,000 in Medicaid reimbursement ($100).

97. On July 15, 2011, Defendant disbursed to himself from his trust account an additional $1,078.37 by check (check number 2805), which was to be provided to Lewis for the necessary expenses of her minor son.

98. Although the State Bar had alleged that Defendant did not disburse the $1,078.37 to Lewis (Defendant claimed that he cashed the check and provided the cash to Lewis), Lewis did not appear to testify as subpoenaed by the State Bar and therefore, because of the absence of clear, cogent, and convincing evidence, the State Bar did not pursue this allegation.

99. Following the disbursements to Defendant referenced in Paragraphs 96 and 97 above, a total of $2,488.31 should have remained in Defendant's trust account to cover the remaining Medicaid reimbursement ($2,375.91) and Defendant's expenses ($112.50).

100. As referenced in Paragraph 84 above, on July 28, 2011 Defendant disbursed to client Nancy Mack a check from his trust account in the amount of $6,250.

101. Defendant's trust account balance fell to $251.07 on August 18, 2011.

102. Defendant's trust account balance was zero as of May 3, 2012.

9

103. On October 1, 2012, Defendant paid the Division of Medical Assistance a check in the amount of $2,375.91 from his operating account, representing the Medicaid reimbursement which he should have paid out of the entrusted settlement funds for Lewis's minor son in July 2011, over one year earlier.

104. An analysis of Defendant's trust account by the State Bar investigator showed that the $2,375.91 in entrusted funds for Lewis's minor son were used by Defendant to cover other over disbursements from his trust account, including the shortage and negative balance created by the August 18, 2011 disbursement to Nancy Mack of $6,250.

105. At the hearing before this panel on May 22-23, 2014, Defendant was questioned about his failure to make the disbursement of $2,375.91 to the Division of Medical Assistance as directed by Judge Hudson in the consent order of July 11, 2011, referenced in Paragraph 94 above, but Defendant provided no credible explanation for his failure to make the required disbursement or what happened to the funds.

106. Defendant misappropriated the $2,375.91 in entrusted funds for Lewis's minor son.

107. On September 19, 2014, only five days prior to the resumption of the hearing before this panel on September 25, 2014, Defendant moved for and obtained an *ex parte* order signed by Judge Hudson purporting to "correct" the July 11, 2011 consent order, and purporting to amend the consent order "to *Nunc Pro Tunc* the actual compliance date to the original compliance date and the court finds that all orders have been complied with per the orders previously entered by this court."

108. The September 19, 2014 *ex parte* order signed by Judge Hudson, referenced in Paragraph 107 above, does not absolve Defendant of the misappropriation of entrusted funds for Lewis's minor son.

## FINDINGS OF FACT REGARDING FIFTH CLAIM FOR RELIEF

109. Courtney Tanner ("Tanner") retained Defendant to represent him in connection with injuries he sustained in separate motor vehicle accidents occurring on December 27, 2009 and March 19, 2010, respectively.

110. On or about April 6, 2012, Defendant and Integon National Insurance Company settled Tanner's claim for the March 19, 2010 accident for $4,500.

111. Defendant deposited the $4,500 settlement into his trust account on April 6, 2012.

112. Defendant did not notify Tanner of the settlement referenced in Paragraph 110 above, and Defendant did not notify Tanner of his receipt of the settlement funds referenced in Paragraph 111 above.

113. Under Defendant's retainer agreement with Tanner, on April 9, 2012 Defendant disbursed to himself a check (check number 2819) from his trust account for $1,500, representing his contingent fee of 33⅓% of the settlement referenced in Paragraph 110 above.

10

114.    Following the disbursement to Defendant for his contingent fee, a total of $3,000 should have remained in Defendant's trust account to be disbursed to Tanner.

115.    As noted above in Paragraph 12 above, on April 23, 2012 Defendant disbursed to himself from his trust account a check (check number 2823) in the amount of $3,000 which Defendant used to purchase a cashier's check in the amount of $3,000 payable to Mary L. Henry.

116.    Following the disbursement to himself of $3,000 in the Mary L. Henry matter, Defendant's trust account balance fell to $1,600 on April 23, 2012.

117.    As of April 23, 2012, a total of $3,000 (in addition to a $1,600 medical reimbursement to Helen Grey) should have remained in Defendant's trust account to be disbursed to Tanner.

118.    An analysis of Defendant's trust account by the State Bar investigator showed that the $3,000 in entrusted funds for Tanner were used by Defendant to purchase the cashier's check in the amount of $3,000 payable to Mary L. Henry.

119.    Defendant and Progressive Universal Insurance Company settled Tanner's claim for the December 27, 2009 accident for $11,700.

120.    Defendant received the $11,700 settlement check from Progressive Universal Insurance Company during the same time period that he was contacted by a State Bar investigator about the complaint from Graham, referenced in Paragraph 18 above.

121.    Because of the State Bar's investigation and impending preliminary injunction freezing his trust account, Defendant did not deposit the $11,700 check into his trust account upon its receipt.

122.     On or about June 8, 2012, Defendant met Tanner at a branch of Bank of America in Durham, North Carolina, and endorsed the $11,700 check to Tanner.

123.    At their meeting at the Bank of America, Defendant informed Tanner for the first time that he had kept the earlier $4,500 in settlement funds as his fee for settling both of Tanner's accident claims.

124.    Until their meeting referenced in Paragraphs 122 and 123 above, Tanner never knew that Defendant intended to keep the entire $4,500 settlement as his fee for settling both of Tanner's accident claims.

125.    Tanner never agreed to Defendant's keeping the entire $4,500 settlement as his fee for settling both of Tanner's accident claims.

126.    Without Tanner's knowledge or agreement, Defendant kept the entire $4,500 settlement, including the $3,000 in entrusted settlement funds which should have been promptly disbursed to Tanner, in order to purchase the April 23, 2012 cashier's check in the amount of $3,000 payable to Mary L. Henry.

127.    Defendant's use of Tanner's $3,000 in entrusted settlement funds to purchase the April 23, 2012 cashier's check in the amount of $3,000 payable to Mary L.

11

Henry was a misappropriation by Defendant for his own and/or someone else's personal benefit, even though Defendant eventually endorsed to Tanner the check for $11,700 in settlement funds from Progressive Universal Insurance Company.

### FINDINGS OF FACT REGARDING SIXTH CLAIM FOR RELIEF

128. Defendant's uncle, John Harper, Jr., received a traffic ticket in Moore County, North Carolina.

129. Defendant represented his uncle on the Moore County ticket, but did not charge his uncle an attorney fee for doing so.

130. Defendant's uncle did not have any entrusted funds in Defendant's trust account.

131. On July 14, 2010, Defendant paid the court costs and fine for his uncle by disbursing a check from his trust account (check number 2774) to the Moore County Clerk of Court in the amount of $155.

132. At the time of the disbursement on behalf of his uncle, Harper did not have sufficient personal earned funds in his trust account to cover the $155 check to the Moore County Clerk of Court.

133. During the same time period (June 17, 2010 thru July 19, 2010), Defendant's operating account showed financial strain, including a closing balance of minus $17.85 on July 19, 2010 and an average balance during June 17, 2010 to July 19, 2010 of $156.03.

134. Defendant's trust account balance on June 30, 2010 was $141.76.

135. Of the $141.76 referenced in Paragraph 134 above, $138.35 was attributed to Henry McGhee's entrusted fund balance.

136. On July 6, 2010, Defendant made a deposit of $50 to his trust account to increase the balance to cover the check to the Clerk of Court on behalf of his uncle, referenced in Paragraph 127 above.

137. Defendant thereafter made withdrawals on July 15, 2010 for $20 (check number 2776) and on July 26, 2010 for $10 (check number 2780), leaving a balance in his trust account of $6.76.

138. An analysis of Defendant's trust account by the State Bar investigator showed that the Defendant used proceeds from the entrusted funds for his client McGhee to cover the shortage created by the disbursement on behalf of his uncle.

139. Defendant misappropriated funds of other clients to cover the disbursement he made on behalf of his uncle.

### FINDINGS OF FACT REGARDING SEVENTH CLAIM FOR RELIEF

140. From January 2010 through June 2012, Defendant failed to conduct monthly reconciliations of his trust account.

141.    From January 2010 through June 2012, Defendant failed to conduct quarterly reconciliations of his trust account.

142.    From January 2010 through June 2012, Defendant failed to keep accurate records of the funds received and disbursed on behalf of his clients.

## ADDITIONAL FINDINGS OF FACT

143.    On March 2, 2006, the State Bar's auditor performed a random audit of Defendant's trust account.

144.    Following the audit, the State Bar's auditor notified Defendant in writing and Defendant acknowledged a number of trust account deficiencies pursuant to 27 N.C. Admin. Code, Ch. 1B, Rule 1.15-1 *et. seq.* of the Revised Rules of Professional Conduct, including: (a) not maintaining a ledger for each person or entity from whom or for whom trust money was received; (b) trust account not reconciled quarterly; (c) original deposit slip did not identify source of funds if other than personal; (d) written accountings not always provided to client at completion of disbursement or at least annually if funds are held more than twelve (12) months; (e) provide assurance to the State Bar that the trust account had been reconciled for the month of February 2006; (f) reference list was needed to identify client file number on checks; and, (g) check numbers did not always appear on clients' ledgers.

145.    In the Procedural Review Summary of the audit, the State Bar's auditor marked in the affirmative that, under Rule 1.15-2(j), Defendant had given assurance that he had not used or pledged any entrusted property to obtain credit or other personal financial benefit for the lawyer or any other person other than the legal or beneficial owner of that property.

146.    In the Procedural Review Summary of the audit, the State Bar auditor marked in the affirmative that, under Rule 1.15-2(l), Defendant promptly notified a client of the receipt of any funds, securities or property belonging in whole or in part to the client.

147.    On March 15, 2006, Defendant provided to the State Bar auditor the reconciliation of his trust account for February 2006, and reported that "all deficiencies [noted in the audit] have been corrected."

148.    Based upon the earlier random audit by and feedback from the State Bar's auditor, Defendant knew of the requirement for monthly and quarterly reconciliations of his trust account but did not conduct such reconciliations in the January 2010 to June 2012 time period.

149.    Based upon the earlier random audit by and feedback from the State Bar's auditor, Defendant knew of the requirement to keep accurate records of the funds received and disbursed on behalf of his clients but did not keep such accurate records in the January 2010 to June 2012 time period.

13

150. Defendant did not maintain accurate ledger cards for his clients from whom or for whom entrusted monies were deposited in or disbursed from his trust account in the January 2010 to June 2012 time period.

151. In the January 2010 to June 2012 time period, Defendant did not provide written accountings or settlement statements to his clients showing receipts and disbursements from his trust account on their behalf.

152. On April 10, 2012, Defendant made a disbursement by check (check number 2820) from his trust account to Davion Tilley ("Tilley") in the amount of $125.

153. On the client ledger card for Defendant's client "Helen Grey," Defendant attributed the disbursement to Tilley of $125 by check number 2820 to the account of client Helen Grey.

154. Tilley was an AAU basketball player, and Defendant made the disbursement to Tilley in order for Tilley to purchase a pair of basketball shoes.

155. Tilley had no connection or relationship to Defendant's client Helen Grey.

156. Tilley was not entitled to the disbursement from Defendant's trust account.

157. The State Bar investigator's analysis of Defendant's trust account showed that at the time of Defendant's disbursement to Tilley, Defendant did not have sufficient personal earned funds in his trust account to cover the $125 check to Tilley.

158. On April 12, 2012, Defendant made a deposit into his trust account of a medical reimbursement check in the amount of $2,000 in connection with the settlement of client Helen Grey.

159. On April 13, 2012, Defendant made a disbursement to himself from his trust account by check (check number 2821) in the amount of $275.

160. On the client ledger card for Defendant's client "Helen Grey," as well as on the image of check number 2821 referenced in Paragraph 159 above, Defendant attributed the disbursement to himself of $275 to the account of client Helen Grey.

161. Defendant's disbursement to Tilley on April 10, 2012 posted on April 11, 2012.

162. Defendant did not disburse to himself the $275 as his fee (via check number 2821) in the Helen Grey matter until April 13, 2012.

163. Defendant's testimony before this hearing panel of the Disciplinary Hearing Commission was not credible.

14

Based upon the foregoing Findings of Fact, the panel enters the following

## CONCLUSIONS OF LAW

1.      All parties are properly before the hearing panel and the panel has jurisdiction over Defendant, Christopher G. Harper, and the subject matter of this proceeding.

2.      Misappropriation by a lawyer of clients' entrusted funds is serious misconduct that reflects adversely on a lawyer's fitness to practice law.

3.      Defendant's conduct, as set out in the Findings of Fact above, constitutes grounds for discipline pursuant to N.C. Gen. Stat. § 84-28(b)(2) under the North Carolina Rules of Professional Conduct as follows:

a) By failing to identify, hold and maintain the entrusted funds from Graham in his trust account, and by failing to promptly deposit the entrusted funds from Graham in his trust account, Defendant violated Rules 1.15-2(a) and 1.15-2(b);

b) By cashing the check from Graham for $3,800 and withdrawing another $3,000 from his trust account that belonged to other clients, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

c) By cashing the check from Graham for $3,800 and withdrawing another $3,000 from his trust account that belonged to other clients, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

d) By failing to make disbursements to McGhee from his trust account of the funds to which McGhee was entitled under the settlement, Defendant failed to promptly pay or deliver to his client the entrusted property belonging to the client and to which the client was entitled, in violation of Rule 1.15-2(m);

e) By making disbursements to himself of McGhee's entrusted settlement funds and by using McGhee's entrusted settlement funds to cover shortages from his other trust account disbursements, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

15

f) By making disbursements to himself of McGhee's entrusted settlement funds and by using McGhee's entrusted settlement funds to cover shortages from his other trust account disbursements, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

g) By failing to make disbursements to Mack from his trust account of the funds to which Mack was entitled under the settlements, Defendant failed to promptly pay or deliver to his client the entrusted property belonging to the client and to which the client was entitled, in violation of Rule 1.15-2(m);

h) By making disbursements to himself of Mack's entrusted settlement funds, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

i) By making disbursements to himself of Mack's entrusted settlement funds and by using other clients' entrusted funds to cover the shortage created by the disbursement to Mack, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

j) By making the disbursement to client Mack in July 2011 using, in part, Shanicka Lewis's minor son's entrusted settlement funds, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

k) By using Shanicka Lewis's minor son's entrusted funds to cover the shortage created by the disbursement to Mack, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

l) By failing to make disbursements to Tanner from Defendant's trust account of the funds to which Tanner was entitled under the settlement, Defendant failed to promptly pay or deliver to his client the entrusted property belonging to the client and to which the client was entitled, in violation of Rule 1.15-2(m);

m) By making the disbursements to Tilley and himself in the Helen Grey and Mary Henry matters, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither

Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

n) By using the entrusted funds of Tanner to cover the shortages created by the disbursements to Tilley and himself, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

o) By making the disbursement to the Moore County Clerk of Court on behalf of his uncle, John Harper, Jr., from his trust account, Defendant used entrusted property for his own personal benefit or for the personal benefit of another when neither Defendant nor the other were the legal or beneficial owner of that property, in violation of Rule 1.15-2(j);

p) By using the entrusted funds of McGhee to cover the shortage created by the disbursement on behalf of his uncle, Defendant committed criminal acts that reflect adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects in violation of Rule 8.4(b), and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);

q) By failing to conduct monthly and quarterly reconciliations of his trust account, Defendant violated Rule 1.15-3(d); and,

r) By failing to keep accurate records of the funds received and disbursed on behalf of his clients, Defendant violated Rule 1.15-3(b)(5).

Based upon the evidence, the hearing panel also finds by clear, cogent, and convincing evidence the following

## ADDITIONAL FINDINGS OF FACT CONCERNING DISCIPLINE

1. Defendant has substantial experience in the practice of law.

2. Defendant's misconduct occurred in connection with his representation of clients.

3. On September 19, 2014, only five days prior to the resumption of the hearing before this panel, Defendant moved for and obtained an *ex parte* temporary restraining order ("TRO") from Judge Hudson in *Christopher G. Harper v. Edward White, Nancy Mack, Henry McGhee, Courtney Tanner, Shanicka Lewis, & Helen Gray*, No. 14-CVS-4829 (Durham Co. Super. Ct.), alleging that he had commenced a civil suit (Defendant did not file a complaint, but obtained summonses with leave to file a complaint) against the named defendants who were potential witnesses against him in this disciplinary proceeding.

17

4. The TRO purported to prevent the named defendants (all of the named defendants, except State Bar Investigator Ed White, were Defendant's former clients) from testifying against Defendant in the disciplinary proceeding scheduled to resume on Thursday, September 25, 2014.

5. Defendant obtained the TRO without notice to the named Defendants.

6. As a result of the issuance of the *ex parte* TRO, the State Bar's Office of Counsel was required to take extraordinary measures on an exigent basis to stay the TRO so that this proceeding could resume as scheduled, including emergency petitions to the North Carolina Court of Appeals.

7. On Wednesday, September 24, 2014, the North Carolina Court of Appeals allowed the State Bar's motion for temporary stay and stayed Judge Hudson's TRO, allowing the disciplinary hearing to proceed as scheduled. *Harper v. White, et al.,* No. P14-744 (N.C. Ct. of App., Order of Sept. 24, 2014).

8. The State Bar has an important public interest in the completion of its disciplinary hearings, and Defendant sought to subvert that interest by obtaining the *ex parte* TRO from Judge Hudson.

9. Defendant's actions in attempting to subvert the State Bar's important public interest in its disciplinary hearings and his collateral unfounded civil action against potential witnesses against him show that he refuses to acknowledge the wrongful nature of his conduct and that he elevates his own interest above that of his former clients.

10. Defendant enjoys a reputation in the Durham community of being a compassionate attorney.

Based upon the Findings of Fact, Conclusions of Law, and Additional Findings Regarding Discipline, the hearing panel also enters the following

## DISCIPLINE CONCLUSIONS

1. The hearing panel has carefully considered all of the different forms of discipline available to it. In addition, the hearing panel has considered all of the factors enumerated in 27 N.C. Admin. Code 1B § .0114(w)(3) of the Rules and Regulations of the North Carolina State Bar and finds the following factors are applicable in this matter:

   a. No prior disciplinary offense;

   c. A dishonest or selfish motive;

   f. Defendant engaged in a pattern of misconduct;

   g. There were multiple offenses;

   o. Defendant refused to acknowledge the wrongful nature of his conduct, but, after the hearing panel announced its findings in the Phase One hearing,

18

Defendant did acknowledge to the hearing panel the wrongful nature of his conduct;

p. Defendant expressed remorse for his conduct after the hearing panel's findings were announced;

q. Defendant's good character or reputation for honesty in the community;

r. The vulnerability of the victims; and,

s. Defendant's substantial experience in the practice of law.

2. The hearing panel has carefully considered all of the factors enumerated in 27 N.C. Admin. Code 1B § .0114(w)(1) of the Rules and Regulations of the North Carolina State Bar and finds the following factors warrant consideration of suspension or disbarment of Defendant's license:

a. Intent of Defendant to cause the resulting harm or potential harm;

b. Intent of Defendant to commit acts where the harm or potential harm is foreseeable;

c. Circumstances reflecting Defendant's lack of honesty, trustworthiness, or integrity;

d. Elevation of Defendant's own interest above that of the client;

e. Negative impact of Defendant's actions on the clients' or public's perception of the legal profession;

f. Negative impact of Defendant's actions on the administration of justice;

g. Impairment of the clients' ability to achieve the goals of the representation; and

i. Acts of dishonesty, misrepresentation, deceit, or fabrication.

3. The hearing panel has also carefully considered all of the factors enumerated in 27 N.C. Admin. Code 1B § .0114(w)(2) of the Rules and Regulations of the North Carolina State Bar and finds the following factors warrant consideration of suspension or disbarment of Defendant's license:

a. Acts of dishonesty, misrepresentation, deceit, or fabrication;

c. Misappropriation or conversion of assets of any kind to which Defendant or recipient is not entitled, whether from a client or any other source; and,

d. Commission of felonies.

19

4.      Defendant's failure to properly maintain and handle entrusted funds betrays a vital trust that clients and the public place in attorneys and the legal profession.

5.      Defendant's misconduct caused potential significant harm to his clients in that his failure to safeguard entrusted client funds placed his clients' funds at risk.

6.      Defendant's misconduct caused significant harm to multiple of his clients in that he failed to make prompt disbursements of entrusted settlement funds to or on behalf of some clients (though he ultimately paid these clients the sums to which they were entitled).

7.      Defendant's misconduct caused significant harm to one client, Henry McGhee, in that Defendant misappropriated for his own benefit $1,333.35 of McGhee's entrusted funds, never paying McGhee all of the settlement funds to which McGhee was entitled.

8.      Defendant's misappropriations from his clients show that he is untrustworthy and his misappropriations also constitute criminal offenses, demonstrating his unfitness to be an attorney, especially an attorney who handles entrusted funds.

9.      Given the prior random audit of Defendant's trust account which addressed many of the same issues, Defendant is unable or unwilling to conform his conduct to the Rules of Professional Conduct.

10.     Defendant's actions in seeking and obtaining the *ex parte* orders from Judge Hudson show that he refuses to acknowledge the wrongful nature of his conduct and suggest the loss of Defendant's ability to practice law may be the only means of protecting the public from Defendant.

11.     The hearing panel has considered all other forms of discipline available and concludes that any sanction less than disbarment would fail to acknowledge the seriousness of the offenses committed by Defendant, would not adequately protect the public, and would send the wrong message to attorneys and the public regarding the conduct expected of members of the Bar.

Based upon the foregoing Findings of Fact, Conclusions of Law, and Findings Regarding Discipline, the hearing panel enters the following

## ORDER OF DISCIPLINE

1.      Defendant, Christopher G. Harper, is hereby DISBARRED from the practice of law, effective 30 days from the date of service of this order upon him.

2.      Defendant shall submit his license and membership card to the Secretary of the North Carolina State Bar no later than 30 days following service of this order upon him.

20

3.      Defendant shall comply with the wind down provisions contained in 27 N.C. Admin. Code 1B § .0124. As provided in § .0124(d), Defendant shall file an affidavit with the Secretary of the North Carolina State Bar within 10 days of the effective date of this order, certifying he has complied with the wind down rule.

4.      Defendant is taxed with the administrative fees and costs of this action, including the cost of the depositions taken in this matter as allowed by statute. The deposition costs were necessarily incurred for the prosecution of this proceeding. Defendant will receive a statement of costs from the Secretary of the State Bar and Defendant shall pay these costs within 90 days of service of the notice of costs upon him.

Signed by the undersigned Chair with full knowledge and consent of the other members of the Hearing Committee.

This is the 18th day of November, 2014

Steve D. Michael, Chair
Disciplinary Hearing Committee

21